King, J.
Plaintiffs, Massachusetts Eye and Ear Infirmary and Melrose-Wakefield Hospital, seek judicial review under G.L.c. 30A, §14 of five decisions of the defendant, Massachusetts Division of Medical Assistance (Division), denying payment of the plaintiffs’ invoices for inpatient admissions. Plaintiffs also seek a declaration, pursuant to G.L. 231A, that the Division’s administration of its Utilization Management Program, known as the Prepayment Review Program, is inconsistent with federal Medicaid regulations, unconstitutionally vague and arbitrary and capricious, thus depriving plaintiffs of substantive due process of law. Plaintiffs move for summary judgment on all claims asserted in their complaints. The Division has filed a cross-motion for summary judgment. The parties have filed a stipulation as to the material facts relating to the regulatory background of this controversy. After considering the stipulations of fact, the administrative record, the briefs and argument of counsel, the court will grant summary judgment in favor of the plaintiffs.
SUMMARY OF DISPUTE
Before detailing the factual background and discussing the legal issues generated by this controversy, a brief synopsis of the dispute will assist the reader in understanding the issues raised by this case.
The plaintiffs have contracts with the Division which entitle them to be paid for medically necessary services rendered to Medicaid recipients. These services can be billed as either inpatient services or outpatient services. The payment for inpatient services is greater than the payment for outpatient services. The plaintiffs submitted bills for the five patients who are the subject of this appeal, requesting payment for inpatient services. The Division determined that the services should have been billed as outpatient services. For this reason, under the Division’s regulations, the plaintiffs forfeited their right to receive any compensation whatsoever. Under the federal Medicaid regulations, the plaintiffs’ inpatient bills were proper. The Division, however, does not follow the federal Medicaid regulations. Instead, the Division follows its own regulations for determining when services should be billed as outpatient services or as inpatient services. The problem with the Division’s regulations is that they are so vague that they provide hospital administrators with absolutely no guidance to enable them to know which services should be billed as inpatient and which services should be billed as outpatient. In practice, the standard employed by the Division is as follows:
outpatient services are services which the Division determines to be outpatient services; inpatient services are services which the Division determines to be inpatient services.
The court finds that this standard deprives the plaintiffs of substantive rights.
BACKGROUND
A. Medicaid scheme under federal and Massachusetts law.
The Medical Assistance Program, known as Medicaid, is a joint federal/state program established under Title XIX of the Social Security Act. See 42 U.S.C. §1396; 42 C.F.R. §430.0. The purpose of the Medicaid program is to provide health care services for the poor. *102 Cohen v. Commissioner of Division of Medical Assistance, 423 Mass. 399, 401-02 (1996). In order to receive federal funding, the State program must be approved and meet all the requirements of Title XIX and the implementing regulations. Haley v. Commissioner of Public Welfare, 394 Mass. 466, 467 (1985). Under the Medicaid program, Massachusetts pays health care providers for a full range of health care services, including physician services, hospital services and long term care services, provided to eligible low income Medicaid recipients. The Commonwealth then receives partial federal reimbursement for these expenditures. See 42 C.F.R. §§447.1 et seq.
The Division is the State agency responsible for administering the Medicaid program in Massachusetts. See G.L.c. 118E, §1; G.L.c. 6A, §16A. Federal Medicaid law, 42 U.S.C. §1396a(a)(30)(A), requires that the Division:
provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan (including but not limited to utilization review plans as provided for in Section 1396b(I){4) of this title) as maybe necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area . . .
In order to implement the federal mandate under 42 U.S.C. §1396a(a)(30)(A), the Division, pursuant to its Utilization Management Program, reviews the costs of services for which the health care providers seek payment. See 130 C.M.R. §450.207. Health care providers may seek reimbursement for inpatient and outpatient services if certain requirements are met. As part of the Utilization Management Program, the Division administers a Prepayment Review Program which reviews invoices for inpatient admissions. See 130 C.M.R. §450.211.
The Division conducts the prepayment review through its contractor, Massachusetts Peer Review Organization (MassPRO). Under the Prepayment Review Program, after an invoice for inpatient services has been submitted by the health care provider, Mass-PRO, in selected cases, will request the entire medical record for review. MassPRO conducts prepayment reviews on invoices submitted by the health care providers. Upon receiving the records, MassPRO will review the entire medical record, after the hospitaliza-, tion but prior to payment, to “determine the medical necessity of the admission or admissions and the length of stay and to assess the quality of care provided." 130 C.M.R. §450.211(B).
The standard for determining whether an admission is a “medical necessity" is delineated in 130 C.M.R. §450.204(A) and is essentially a two-prong test. Under the regulation, a service is “medically necessary” if it is
(1) reasonably calculated to prevent, diagnose, prevent the worsening of, alleviate, correct, or cure conditions in the recipient that endanger life, cause suffering or pain, cause physical deformity or malfunction, threaten to cause or to aggravate a handicap, or result in illness or infirmity; and
(2) there is no other equally effective course of treatment available or suitable for the recipient requesting the service that is more conservative or substantially less costly . . .
Payment rates for services provided on an inpatient basis by acute hospitals, such as plaintiffs, are “established by contract between the provider of acute hospital services and [the Division] [and are] subject to all applicable Title XIX statutory and regulatory requirements.” G.L.c. 6B, §2(a). In general, under their contracts with the Division, acute hospitals are paid a set dollar amount for each inpatient admission of between one and twenty acute days, regardless of the actual length of the admission or the treatment provided. Thus, a hospital will receive the same compensation for treating a woman for an uncomplicated childbirth as a heart attack patient who spends 20 days in intensive care. The compensation paid to a hospital for treating a patient on an outpatient basis is substantially less than the amount paid for inpatient treatment.
The Division will not pay a health care provider for otherwise “medically necessary” inpatient services if the Division determines that the services should have been billed on an outpatient rather than an inpatient basis. Under these circumstances, the health care provider receives no reimbursement at all for the Medicaid services rendered.
State regulations, however, do not expressly define the terms “inpatient” or “hospital level of care.” State regulations do define “outpatient services” as “services provided to recipients on an outpatient basis in hospital outpatient departments.” 130 C.M.R. §410.402. A “hospital outpatient department” is defined as “a department or unit within the physical framework of the hospital that operates under the hospital’s license and provides services to recipients on an outpatient basis,” including “day surgery units, primary care clinics, specialty clinics, and emergency departments.” 130 C.M.R. §410.402.
In contrast, federal Medicaid regulations, 42 C.F.R. §440.2(a), specifically define inpatient as:
a patient who has been admitted to a medical institution as an inpatient on recommendation of a physician or dentist and who—
(1) Receives room, board and professional services in the institution for a 24 hour period or longer..."
*103 Likewise, outpatient is specifically defined in 42 C.F.R. §440.2(a) as:
a patient of an organized medical facility, or distinct part of that facility who is expected by the facility to receive and who does receive professional services for less than a 24-hour period regardless of the hour of admission, whether or not a bed is used, or whether or not the patient remains in the facility past midnight.
Lastly, from October 1, 1993 to September 30, 1994, during which time the medical treatments at issue in these cases took place, both Massachusetts Eye and Ear Infirmary and Mehrose-Wakefield Hospital received Medicaid payments pursuant to a contract with the Division which provided that “observation” would be paid at the outpatient rate. The contract with the Division defined “observation services” as:
outpatient services delivered on-site at a hospital including the use of a bed and intermittent monitoring by professional licensed staff which is reasonable and necessary to evaluate an outpatient’s condition in order to determine the need for a possible admission to the hospital as an inpatient. Such services are covered only when provided under the order of a physician. Observation services usually do not, but may, exceed 24 hours.
B. Proceedings before the Division
Following is a summary of facts relating to each of the five cases where a plaintiff hospital was denied any compensation for medically necessary services simply because the services were billed as inpatient instead of outpatient. The parties agree that the only dispute in these five appeals is whether the Division was properly billed for inpatient services.
1. Massachusetts Eye and Ear Infirmary (Infirmary)
In the present action, the Infirmary challenges the Division’s decision to deny reimbursement for services rendered on an inpatient basis in two cases.
Patient G.Z.
G.Z. was a three week old infant with congenital glaucoma in both eyes. G.Z. came to the Infirmary on August 23, 1994 to undergo an optical surgical procedure called a trabeculotomy. MassPRO had given a Preapproval Review for admitting G.Z. as an inpatient on the understanding that both eyes would be operated on during the same admission. G.Z., however, only had the procedure performed on one eye. The procedure was accomplished without complications. G.Z. was admitted as an inpatient and discharged the following day.
The Infirmary presented the Division with an invoice for inpatient services rendered in G.Z.’s case. On March 14, 1995, the Division, through MassPRO, denied payment on the grounds that “[t]he care that was rendered could have been safely provided in an outpatient setting." The Infirmary appealed the denial and an adjudicatory hearing was held before the Division’s Board of Hearings. The Division agreed that the care that was given was appropriate. The dispute centered around whether it could have been given in an outpatient setting.
The treating physician, Dr. David Walton, submitted an affidavit in which he stated that he admitted G.Z. based on the need for postoperative monitoring for bleeding, changes in intraocular pressure, an infant’s special needs, the lengthy period of general anesthesia, and G.Z.’s prior approval for inpatient admission. Dr. Walton stated that postoperative care required that G.Z.’s head be elevated and G.Z. needed to remain in the Infirmary to assure correct positioning in order to minimize the risk of bleeding.
The Division’s physician, Dr. MaiyLou Buyse, testified that the procedure was performed without complications and the patient’s recovery was totally routine. She testified that the care that was given could have been given in the ambulatory care unit of the Infirmary. Dr. Buyse stated that she did not dispute Dr. Walton’s decision to observe G.Z. postoperatively. Rather, Dr. Buyse simply stated that the observation could have been done in an ambulatory setting.
After weighing the evidence, the Hearing Officer upheld the Division’s decision to deny reimbursement to the Infirmary. The Hearing Officer concluded that the “orders for post procedure care do not indicate the need for the intensity of inpatient care.” The Hearing Officer did not contest the need for an observation period but found that the observation could have been done in the outpatient setting, such as the post-anesthesia recovery area.
Patient J.B.
Patient J.B. was a four and one half year old boy with a history of neurological developmental delay, mental retardation, a seizure disorder, severe gastric reflux and renal failure. Since 1991, J.B. has had a tracheal tube in place. The tracheal tube is normally changed by J.B.’s home care nurse. On September 27, 1994, J.B.’s nurse was unable to replace the tracheal tube. A smaller tube was inserted and J.B. was transported to the Infirmary. At the Infirmary, J.B. underwent a laryngoscopy and bronchoscopy to check for any obstructions, which there were none, and replacement of his tube. The procedures were performed with no complications. J.B. was admitted after recovering in the post-anesthesia care unit. He was discharged the next day.
The Infirmary submitted an invoice to the Division for inpatient services rendered to J.B. On February 22, 1995, the Division, through MassPRO, denied payment on the grounds that “[although the care was appropriate, the intensiiy of services did not require an acute inpatient admission. The services rendered *104 could have been safely provided in an outpatient setting." The Infirmary appealed the decision and an adjudicatory hearing was held before the Division’s Board of Hearings.
Dr. Michael J. Cunningham, the treating physician, submitted an affidavit in support of the inpatient admission. Dr. Cunningham stated that he admitted J.B. based on his complicated medical history, his tracheal tube reliance, the fact that the home care nurse had had difficulties inserting the tube, the potential adverse effects of anesthesia on J.B. and the risk of airway obstruction.
The Division’s physician, Dr. Buyse, testified that the treatment given was appropriate but that the treatment did not require an inpatient hospital level of care. Dr. Buyse stated that after the procedure, J.B. was stable, had no complications and had more than adequate home care. She testified that J.B. did not need to be in a hospital setting for the treatment he received. Dr. Buyse stated that the care could have been given at J.B.’s home or in an observation unit at the Infirmary.
After weighing the evidence, the Hearing Officer determined that the Division’s denial of payment to the Infirmary was proper. The Hearing Officer concluded that the treatment provided was appropriate and that while J.B.’s need for endoscopic airway assessment was necessary, it did not require an inpatient hospital setting. The Division does not contest that the treatment rendered to J.B. was medically appropriate. Rather, the Division contends that the services should have been billed as outpatient services instead of inpatient services.
2. Melrose-Wakefield Hospital (Hospital)
In the present action, the Hospital challenges the Division’s decision to deny payment for inpatient admission in three cases.
Patient S.P.
On July 12, 1994, S.P., a 31 year old female with a history of migraine headaches, came to the Melrose-Wakefield emergency room. Three days prior to her admission, she had received one dose each of Demerol and Vistaril as an outpatient. On July 12th, she was treated in the emergency room with intramuscular doses of Demerol and Vistaril and intravenous fluids. Less than two hours later, the admitting physician, Dr. Roger Kinnard, admitted S.P. as an inpatient. S.P. received doses of Demerol and Vistaril intramuscu-larly every four hours. The treatment had only a fair effect and S.P. was discharged the next day.
The Hospital subsequently forwarded an invoice for • payment of medical services rendered to S.P. to the Division for reimbursement under the Medicaid program. On January 10, 1995, MassPRO, after a prepayment review, notified the Hospital that it was denying its request for reimbursement on the grounds that S.P.’s inpatient admission was not medically necessary because “evaluation and treatment that this patient required could have been safely performed in a lesser setting.”
The Hospital appealed the decision to the Division’s Board of Hearings and an adjudicatory hearing was held on March 29,1995 and June 7, 1995. The parties agreed that the treatment rendered to S.P. was appropriate under the first prong of the medically necessary standard in 130 C.M.R. §450.204(A)(1). The dispute centered on the setting of the treatment; whether the treatment could have been provided on an outpatient basis.
At the hearing, Dr. Kinnard testified that the basis for S.P.’s admission was that the Demerol and Vistaril given to S.P. in the emergency room did not break the migraine and the inpatient admission would allow for round the clock administration of intramuscular narcotics. Further, Dr. Kinnard testified that he would not prescribe large doses of this medication to be administered at home and he believed that S.P. was incapable of self-administration of such medication. Additionally, S.P. was allergic to some antimigraine medication thus limiting treatment options. Dr. Kinnard conceded that he does not always admit patients with retractable migraine headaches and that he had admitted S.P. in the past for treatment with only a fair response.
Dr. Mark Kowolski, the Division’s physician, testified that there had not been an adequate trial of outpatient therapy with intramuscular analgesics and antimigraine medication to determine its effectiveness in breaking S.P.’s migraine. Dr. Kowolski further testified that the treatment given to S.P. upon admission could have been performed in a lesser setting.
After weighing the evidence, the Hearing Officer determined the Division had properly denied payment to the Hospital. The Hearing Officer was persuaded by the Division’s assertion that the standard treatment for migraine patients such as S.P. would first have been an outpatient trial of the effectiveness of the prescribed treatment. The Hearing Officer held that this was not done and thus substantial evidence existed that, under the second prong of the medically necessary standard, another equally effective course of treatment could have been provided that was more conservative or substantially less costly.
Patient H.D.
On April 22, 1994, H.D., a 23 weeks pregnant, 17 year old female, came to the Hospital with complaints of abdominal pain and nausea. An ultrasound was performed and revealed a right hydronephrosis with no calculi. She was given intravenous hydration and pain medication and then sent home. Because of continued nausea and vomiting, H.D. was admitted on April 23, 1994 with orders for intravenous hydration, intramuscular pain medication and for a urology consultation. The urology consultation was performed on April 24, 1994 and a cystoscopy with stent placement *105 was recommended. The procedure was performed that same day without complications. A repeat ultrasound was performed on April 25, 1994 which showed that the right urethal stent was in place and a mild hydronephrosis was present. H.D. was discharged on April 25, 1994.
The Hospital submitted an invoice to the Division for reimbursement of medical services rendered to H.D. On November 23, 1994, the Division, through MassPRO, notified the Hospital that it was denying its request for payment, reasoning that “while the care rendered was appropriate, it could have been safely managed in a lesser setting.” The Hospital appealed the decision to the Division’s Board of Hearings and requested an adjudicatory hearing.
At the hearing, the treating physician, Dr. Brian O’Connor, testified that he admitted H.D. because of her complaints of nausea, vomiting and pain. He further testified that a prior course of outpatient treatment on April 22nd had not worked because H.D. returned to the Hospital on April 23rd. Dr. O’Connor admitted H.D. because she could not be managed on an outpatient basis; the intravenous hydration and urology procedure required inpatient care.
Dr. Kowolski, the Division’s physician, testified that the cystoscopy and stent placement were outpatient procedures and would not require inpatient admissions where there were no complications. Dr. Kowolski stated because H.D. experienced no complications during the procedure, there was no requirement that H.D. be placed in an inpatient setting for her postoperative care.
After weighing the evidence, the Hearing Officer determined that the Division’s denial of the Hospital’s request for reimbursement was appropriate. In reaching this conclusion, the Hearing Officer stated that “the evidence is that H.D. was admitted for a urology consultation and possible stent placement. H.D.’s discomfort from her hydronephrosis is not characterized as severe in her medical record. H.D. denies nausea and vomiting upon admission. H.D. received no pain medication prior to the procedure." The Hearing Officer concluded that H.D.’s care could have been provided in an outpatient setting. Once again, there was no dispute that the medical care rendered to H.D. was appropriate. The only fault found was that the services should have been billed on an outpatient basis instead of an inpatient basis.
Patient K.B.
Patient K.B. was an 8 weeks pregnant, 21 year old female. She came to the Hospital’s emergency room on August 18, 1994 with complaints of sudden onset of right lower quadrant pain. She was diagnosed with having an ectopic pregnancy. That same afternoon, K.B. underwent a laproscopic right partial salpingectomy (termination of her pregnancy). The surgery was performed without complications. K.B. did not return from surgery until 11:00 p.m. Due to the lateness of the hour K.B. was admitted as an inpatient. She was given one dose of Demerol intramuscularly and was discharged the following afternoon.
The Hospital submitted an invoice to the Division for inpatient services rendered to K.B. On January 30, 1995, the Division, through MassPRO, notified the Hospital that it was denying its request for payment on the grounds that “(t]he treatment that was provided would have been safely rendered in an outpatient setting rather than as an inpatient admission.” The Hospital appealed the decision and requested an adjudicatory hearing before the Division’s Board of Hearings.
The parties agreed that the treatment that was rendered to K.B. was appropriate. The parties disputed whether the care could have been given in a less costly setting. Dr. Daniel Witkowski, tire attending physician and also K.B.’s primary care physician, testified that the procedure performed is usually done on an outpatient basis. Dr. Witkowski, however, admitted K.B. because it was close to midnight, she was the single parent of a two year old and he was concerned that she may not have had anyone at home to help her that late at night. K.B.’s medical record reveal that K.B. had answered “yes” to the question of whether there would be anyone to help her upon discharge. Dr. Witkowski stated that although he was aware that K.B.’s grandmother was at K.B.’s home, “it was not a comfortable situation” and he did not know whether the grandmother would be awake should K.B. need her at 2:00 a.m.
Dr. Kowolski, the Division’s physician, testified that K.B. experienced no complications from the surgery and that there was no medical necessity to admit K.B. The basis for her admission was the timing of the surgery and the social and living conditions of K.B.
The Hearing Officer determined that the Division properly denied payment to the Hospital. The Hearing Officer concluded that K.B.’s care could have been provided in the outpatient setting. The Hearing Officer found that the medical records demonstrated that K.B. had assistance if needed upon discharge and that K.B.’s medical needs did not require inpatient treatment.
In each of the cases challenged by the plaintiffs, there is no dispute that the medical treatment provided to each of the patients was necessary and appropriate. The dispute centers solely on whether the services should have been billed on an inpatient or outpatient basis.[3]
DISCUSSION
The party appealing an administrative decision bears the burden of demonstrating the decision’s invalidity. Merisme v. Board of Appeal on Motor Vehicle Liab. Policies and Bds., 27 Mass.App.Ct. 470, 474 (1989); Faith Assembly of God v. State Bldg. Code *106 Comm’n., 11 Mass.App.Ct. 333, 334 (1981) (citations omitted).
In reviewing the agency decision, the court is required to give due weight to the agency’s experience, technical competence, special knowledge and the discretionary authority conferred upon it by statute. Flint v. Commissioner of Pub. Welfare, 412 Mass. 416, 420 (1992), quoting G.L.c. 30A, §14(7). The reviewing court may not substitute its judgment for that of the agency. Southern Worcester County Regional Vocational School Dist. v. Labor Relations Comm’n, 386 Mass. 414, 420-21 (1982), citing Olde Towne Liquor Store v. Alcoholic Beverages Control Comm’n, 372 Mass. 152, 154 (1977).
A court may set aside an administrative agency’s decision if it determines, based on the record before it, “that the substantial rights of any party may have been prejudiced because the agency decision is — (a) [i]n violation of constitutional provisions; or (b) [i]n excess of the statutory authority or jurisdiction of the agency; or (c) [biased upon an error of law; or (d) [m]ade upon unlawful procedure; or (e) [unsupported by substantial evidence; or (f) [u]nwarranted by facts found by the court on the record as submitted . . . ; or (g) [arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with the law.” G.L.c. 30A, §14(7). ”[T]o the extent that an agency determination involves a question of law, it is subject to de novo judicial review.” Raytheon Co. v. Director of Division of Employment Security, 364 Mass. 593, 595 (1974). An agency’s decision is arbitrary and capricious when it is without evidentiary support. Massachusetts General Hospital v. Commissioner of Public Welfare, 350 Mass. 712 (1966). Substantial evidence is “such evidence as a reasonable mind might accept as adequate to support a conclusion." G.L.c. 30A, §1(6).
In this case the plaintiffs contend that the regulations on which the administrative decisions were based, 130 C.M.R. §450.204A, §450.211 and §410.402, conflict with federal Medicaid regulations, are unconstitutionally vague, and violate the plaintiffs due process rights secured by the Fourteenth Amendment to the United States Constitution.
I. The services rendered by the plaintiffs are inpatient medical services under federal Medicaid regulations.
Each of the five patients involved in this appeal received hospital services for more than 24 hours. The Division denied the requested compensation for inpatient services because the services should have been billed at the less expensive outpatient rate.
Federal Medicaid regulations, 42 C.F.R. §440.2, define inpatient as:
a patient who has been admitted to a medical institution as an inpatient on recommendation of a physician or dentist and who —
(1) Receives room, board and professional services in the institution for a 24 hour period or longer, or
(2) Is expected by the institution to receive room, board and professional services in the institution for a 24 hour period or longer even though it later develops that the patient dies, is discharged or is transferred to another facility and does not actually stay in the institution for 24 hours.
Likewise, outpatient is defined in 42 C.F.R. §440.2 as:
a patient of an organized medical facility, or distinct part of that facility who is expected by the facility to receive and who does receive professional services for less than a 24-hour period regardless of the hour of admission, whether or not a bed is used or whether or not the patient remains in the facility past midnight.
The Division concedes that the services provided by the plaintiffs in these five cases were inpatient services as that term is defined under the federal Medicaid regulations. The Division argues that it has the right to refuse to pay for inpatient services if the services are not provided in the most cost-effective manner. To this extent, the Division argues that its conduct has not deviated from the requirements of the federal Medicaid regulations. That the Division has the right to review whether the treatment given by a physician was made in the most cost-effective manner is not in dispute. Here, however, it is undisputed that each of the five patients were “inpatient” patients as that term is defined by the federal Medicaid regulations, that the medical services rendered were otherwise medically necessary, that the hospital admissions were appropriate and that the duration of the hospitalizations was appropriate. Under these circumstances, there was no basis for the Division’s conclusion that the services were not rendered in the most cost-effective manner. Under the clear and unambiguous federal Medicaid definition, in each of the five cases involved in this appeal, the patients received inpatient services. The Division’s decisions in these five cases were based on an unlawful procedure and exceeded the Division’s authority because the Division failed to apply the federal Medicaid definition, or some other standard not inconsistent with the federal Medicaid definition.
II. The regulatory scheme for Prepayment Review by the Division is unconstitutionally vague.
Plaintiffs claim that the Division’s administration of the Prepayment Review program is unconstitutionally vague because the Division fails to delineate the standard by which it determines whether an invoice is properly submitted on an inpatient basis or on an outpatient basis. Plaintiffs contend that the Division’s regulations dó not define inpatient or hospital level of care. Thus, health care providers lack guidance on how to properly submit an invoice for inpatient admission. If a health care provider in *107 good faith mistakenly seeks compensation on the basis of inpatient services instead of outpatient services, the health care provider is barred from receiving any compensation whatsoever for the Medicaid services rendered. The Division, however, asserts that the “medically necessary” standard set forth in 130 C.M.R. §450.204A is a sufficient guide for plaintiffs to follow when submitting a request for payment.
“A law is void for vagueness if persons of ‘common intelligence must necessarily guess at its meaning and differ as to its application.’ ” Caswell v. Licensing Commissioner for Brockton, 387 Mass. 864, 873 (1983) (interpreting G.L.c. 140, §177A, the licensing authority for video games); quoting Connally v. General Constr. Co., 269 U.S. 385, 391 (1926). “[V]ague laws that do not limit the exercise of discretion by officials engender the possibility of arbitrary and discriminating enforcement,” thus violating due process. Caswell, supra., citing Grayned v. Rockford, 408 U.S. 104, 108-09 & n.4 (1972). However, in the absence of First Amendment freedoms or criminal conduct, “a less stringent vagueness standard applies.” Caswell, supra. See Lapointe v. License Bd. of Worcester, 389 Mass. 454, 462 (1983) (in interpreting G.L.c. 140, §54, the licensing authority to deal in junk, old materials, and second hand articles, the court held that a “statute which merely regulates business interests need not specify with great particularity the relevant considerations with respect to whether to revoke a license”). Regulatory ambiguities “may be clarified by resort to the administrative process so as to cure a vagueness claim.” Brookline v. Comm'r of the Dept. of Environmental Quality Engineering, 387 Mass. 372, 378 (1982), citing Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 497-98 (1982). In Comm’r of the Dept. of Environmental Quality Engineering, the court found a regulation not unconstitutionally vague in light of the agency’s adoption of a definite pollutant limit through hearings. In Lapointe, the court held that the power to revoke a business license, where limited by the agency’s “exercise of a wise discretion,” was not unconstitutionally vague. Lapointe, supra at 462.
In Cherubino v. Bd. of Registration of Chiropractors, 403 Mass. 350, 352 (1988), the plaintiff argued that a provision proscribing “overutilization of practice”; that is, “practice excessive in quality or amount,” was unconstitutionally vague. In concluding that the phrase, when read in conjunction with other provisions requiring a clinical rationale for supplemental procedures, was not vague, the court found that on the facts of that case a “person of common intelligence” would know that the regulations prohibited the course of treatment taken by the chiropractor. Id. at 357.[4] Cherubino is similar to the present case in that the regulated activity concerns a person’s health, and not merely a business transaction.
The regulations at issue in the present case fail to meet even this less stringent vagueness standard applied in the cited cases. The plaintiffs have no State guidelines which to follow in determining whether to submit an invoice on an inpatient basis or on an outpatient basis. State regulations fail to define inpatient or hospital level of care. To the extent that the Division’s regulations define the term “outpatient,” the definitions are circular and provide absolutely no guidance whatsoever. “A hospital outpatient department” is defined as "a department [which] provides services to recipients on an outpatient basis . . .” 130 C.M.R. §410.402. “Outpatient services” is defined as “services provided to recipients on an outpatient basis in hospital outpatient departments.” 130 C.M.R. §410.402.
According to the Division, treating a patient on an outpatient basis does not necessarily mean sending them home or away from the hospital. Rather, outpatient could mean staying within the walls of the hospital and being treated for more than 24 hours in the “ambulatory care unit” or “post-anesthesia recovery unit” or the “observation unit.” For example, in the case of J.B., the Division’s physician, Dr. Buyse, did not state that J.B. should not have been kept in the hospital overnight. Rather, she testified that his care could have been given in the ambulatory care unit. The problem remains that hospital administrators are given no guidance as to the circumstances under which a patient who is kept in the hospital for more than 24 hours qualifies for reimbursement on an inpatient basis or on an outpatient basis.
The Division further asserts that plaintiffs were placed on notice that “observation[s]” are billed as outpatient services because the Medicaid contract between the parties contains such a provision. The Division’s argument that in the five cases before the court the patients were provided with “observation services,” as defined by the contract,[5] is simply not supported by the administrative record in these cases. The contract definition provides that observation services are to monitor the outpatient’s condition “in order to determine the need for a possible admission to the hospital as an inpatient.” In each of the five cases, the patients had already been diagnosed and treated and were being kept in the hospital to monitor for possible complications. For example, G.Z., a three week old infant with congenital glaucoma in both eyes was pre-approved by the Division for eye surgery. The treating physician kept G.Z. in the hospital overnight to monitor him after a lengthy period of general anesthesia for bleeding and other surgical complications.
Thus, after review of the Division’s regulations, the court rules that the Division fails to set forth with specificity guidelines for plaintiffs to follow in order to differentiate between inpatient and outpatient care. Accordingly, the standards used by the Division, as set out in the applicable regulations, to review invoices *108 for inpatient admissions is unconstitutionally vague and deprives plaintiffs of due process of law. Because the services rendered by the plaintiffs in each of the five cases before the court meet the federal Medicaid definition of inpatient, the court will order the Division to pay each of the invoices in question.
III. The Division’s refusal to reimburse for inpatient services deprives the plaintiffs of substantive due process
As an alternative theory of recovery, the plaintiffs argue that where health care providers are not paid at all on invoices for inpatient care which the Division decides should have been billed as outpatient care, they are deprived of substantive due process. Essentially, the argument is that the overall scheme established by the Division, including the failure to define the terms inpatient and outpatient care, renders the scheme so arbitrary and capricious as to deprive the plaintiffs of their property without substantive due process.
The due process clause of the Fourteenth Amendment to the United States Constitution contains a substantive component that prohibits certain arbitrary governmental actions regardless of the fairness of the procedures used to implement them. Zinermon v. Burch, 494 U.S. 113, 125 (1990).
To show a violation of due process, the plaintiffs must show (1) that there was a constitutionally protected interest and (2) that the plaintiffs were deprived of this interest without due process of law. See Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972). Here, plaintiffs claim a property interest in payments for the services rendered based upon the contract each has signed with the Division. Id. (property interests subject to due process protection are “created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law”). Since the contracts require plaintiffs to “be subject to all applicable . . . statutory and regulatory requirements,” plaintiffs’ expectation of payment is subject to 130 C.M.R. §450.204(A), which provides that the Division will reimburse providers for services which are “medically necessary” as defined by the regulations.
After a refusal by the Division to reimburse inpatient Medicaid costs, the health care provider is without further recourse. Under the Prepayment Review Program, if the Division denies payment for services provided on an inpatient basis, the provider may not submit a claim for payment for the services on an outpatient basis. 130 C.M.R. §415.414(B) (if services are found not to be medically necessary “the Division will not pay for any part of the hospital episode, including the day of admission and any days thereafter”).
In each of the consolidated cases, the Division admits that the actual treatment administered was proper, and admits that it does not disagree with the “intensity, acuity, or level of medical services provided” to the patients. The Division contends, however, that the treatment was not medically necessary because the services could have been rendered in a less expensive outpatient setting, which the Division equates with failure to perform services in the least costly manner. Because plaintiffs did not choose this less expensive setting, the Division argues, plaintiffs are not entitled to payment because they did not comply with the statutory procedures. See G.L.c. 118E, §36(4) (Medicaid providers must “agree to comply with all laws, rules, and regulations governing the operations of the programs”).
The Division contends that its refusal to permit resubmission of claims is valid because it is rationally related to the goal of assuring proper, economic payment of claims by giving providers an incentive to perform services in an economical and efficient fashion. The challenged regulation must be upheld if it bears any rational relationship to a legitimate State interest. Steinbergh v. Rent Control Board, 410 Mass. 160, 164 (1991). Clearly the Division has an interest in requiring that health services be provided to Medicaid recipients in a cost-efficient manner. The Division operates under federal mandates to “safeguard against unnecessary utilization" of the Medicaid system, to “assure that payments are consistent with efficiency, economy, and quality of care,” and to “ensure the proper and efficient payment of claims and management of the program.” 42 U.S.C. §§1396a(a)(30)(A) and 1396a(a)(37)(B). See also Pentucket Manor Chronic Hospital, Inc. v. Rate Setting Commission, 394 Mass. 233, 243-44 (1985). The practice of prohibiting submission of invoices for necessary medical services on an outpatient basis after the Division has refused to pay for such services on an inpatient basis is not, however, rationally related to the stated goals. The plaintiffs did not act wastefully or fraudulently; they performed appropriate services and submitted what they believed to be legitimate claims for those services. To deny payment for those services based upon the manner in which they were billed does not foster the goal of ensuring the “proper and efficient payment of claims and management of the program.” 42 U.S.C. §1396a(a)(37)(B). This is particularly true where, on the facts of this case, the Division provided the plaintiffs with no guidance concerning when a hospitalization for more than 24 hours would be considered an outpatient service as opposed to an inpatient service. The Division’s current practice punishes providers who have performed appropriate health care services based upon the way the billing is submitted without any regard for the Division’s mission to “assure that payments are consistent with efficiency, economy, and quality of care." 42 U.S.C. §1369a(a)(30)(A) (emphasis added).
The Division, in challenging the setting in which the services were provided, is in essence contesting only the manner in which the treatments were billed, and *109 not the appropriateness or necessity of the treatments. Since plaintiffs had a reasonable expectation of compensation for services which were appropriate and could not have been performed in a less costly manner it follows that plaintiffs did not forfeit their property interest in these payments simply because the procedures were labeled inpatient rather than outpatient. See Haverhill Manor, Inc. v. Commissioner of Public Welfare, 368 Mass. 15, 23 (1975) (provider had a property interest which was cognizable under the due process clause where it had provided health services in accordance with the law). Lacking any State guidance on when to bill a procedure on an inpatient basis, plaintiffs did not violate the law. Plaintiffs fulfilled their mandate to provide quality health care to the poor and are entitled to be compensated for those services at the outpatient rate if, ultimately, it is determined that they are not entitled to compensation at the higher, inpatient rate.
CONCLUSION
For the foregoing reasons, the court rules that the Division’s decision in each of the five cases must be annulled because the decisions violated the plaintiffs’ due process rights, were based on an error of law, were based on an unlawful procedure and were not supported by substantial evidence. The court will also grant the plaintiffs an appropriate declaratory judgment.
ORDER
1. The plaintiffs’ motion for summary judgment is granted.
2. The defendant’s motion for summary judgment is denied.
3. Judgment shall enter annulling the decision of the Commissioner of the Division of Medical Assistance in each of the five cases which are the subject of these appeals and the Commissioner shall pay to plaintiffs the amounts requested in their invoices.
4. Judgment shall enter declaring that the Massachusetts Division of Medical Assistance’s Prepayment Review Program, as currently administered with regard to its interpretation of “inpatient” and “outpatient” medical services, is an unlawful administrative agency procedure.

 As of April 4, 1996, out of 104 administrative hearing reviews of the denial of payment for inpatient services since August 1994, held pursuant to 130 C.M.R. §450.211, reversal of the denials has occurred on two occasions.

 The chiropractor in Cherubino administered "costly supportive procedures” to a patient for over a six month period when the injuiy normally required six weeks of treatment. Cherubino, supra. Title 233 C.M.R. §4.03 specifically required that “supportive procedures shall be supplemental or ancillary to the chiropractic adjustment and must not be used as an independent therapy. The use of supportive procedures MUST AT ALL TIMES be supported by a clinical rational...” Id (emphasis in original).

 The plaintiffs’ contract with the Division defined “observation services” as:
“outpatient services delivered on-site at a hospital including the use of a bed and intermittent monitoring by professional licensed staff which is reasonable and necessary to evaluate an outpatient’s condition in order to determine the need for a possible admission to the hospital as an inpatient. Such services are covered only when provided under the order of a physician. Observation services usually do not, but may, exceed 24 hours.” (Emphasis supplied.)